COURT OF CHANCERY
OF THE
STATE OF DELAWARE

J. TRAVIS LASTER
VICE CHANCELLOR

New Castle County Courthouse
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: May 9, 2016
Date Decided: June 3, 2016

Richard H. Cross, Jr.
Christopher P. Simon
Cross & Simon, LLC
1105 North Market Street, Suite 901
P.O. Box 1380
Wilmington, DE 19899

Edward T. Ciconte
Ciconte, Scerba & Kerric, LLC
1300 King Street
P.O. Box 1126
Wilmington, DE 19899

Kenneth M. Dubrow
The Chartwell Law Offices, LLP
130 No. 18th Street, 26th Floor
Philadelphia, PA 19103

RE:     *James v. National Financial, LLC*
        C.A. No. 8931-VCL

Dear Counsel:

On March 14, 2016, this court issued a post-trial opinion which held that a loan agreement between plaintiff Gloria James and defendant National Financial, LLC (the "Disputed Loan") was unconscionable and that National had violated the federal Truth in Lending Act ("TILA"). Dkt. 187 (the "Opinion"). Among other things, the Opinion "awarded [James] her attorneys' fees and costs." *Id.* at 72 (the "Fee Award"). The Opinion stated that if the parties could not agree on the amount of fees owed, "they shall propose a schedule for a fee application." *Id.*

After the parties failed to agree, James made her application. She sought clarification that the Fee Award included all of her attorneys' fees and costs, not just for

the TILA claim. Alternatively, she argued fee shifting was warranted under the bad faith exception to the American Rule. National responded that the Fee Award only extended to the TILA claim and that there was no other basis for fee shifting.

## A.    The Fee Award Under TILA

TILA directs the court to award reasonable attorneys' fees and costs "in the case of any successful action" to enforce Section 1640(a)(2)(A)(i). 15 U.S.C. § 1640(a)(3). "TILA does not define *action*, but its context makes its meaning plain: an action is a lawsuit." *Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183, 185 (4th Cir. 2007). "Just as a plaintiff can prevail when only one of his claims succeeds, so his action can succeed when only one of its constituent claims prevails." *Id.* Absent distinguishing circumstances, such as claims arising out of wholly different transactions or occurrences, the concept of an action under TILA refers to the lawsuit as a whole and not a discrete legal theory. *Id.* Consequently, "a successful TILA claimant may recover all reasonable attorney's fees incurred litigating the lawsuit containing the successful TILA claim, including fees reasonably incurred advancing other, ultimately unsuccessful claims sharing 'a common core set of facts' with the successful TILA claim." *Bradford v. HSBC Mortgage Corp.*, 280 F.R.D. 257, 262 n.6 (E.D. Va. 2012) (quoting *Brodziak v. Runyon*, 145 F.3d 194, 197 (4th Cir. 1998)).

James succeeded in her action. She prevailed on her TILA claim. Her other claims arose out of the same common core of facts as her TILA claim. The Fee Award therefore extends to all of James' attorneys' fees and costs.

**B.**    **The Bad Faith Exception To The American Rule**

Assuming for the sake of argument that TILA did not authorize the Fee Award to extend beyond the TILA claim, James remains entitled to all of her fees and costs under the bad faith exception to the American Rule.

> [A]n award of fees for bad faith conduct must derive from either the commencement of an action in bad faith or bad faith conduct taken during litigation, and not from conduct that gave rise to the underlying cause of action. Further, the bad faith exception applies only in extraordinary cases, and the party seeking to invoke that exception must demonstrate by clear evidence that the party from whom fees are sought acted in subjective bad faith. Our courts have not settled on a singular definition of bad faith litigation conduct, but have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records, or knowingly asserted frivolous claims. Further, we have recognized the bad faith exception where a party is found to have misled the court, altered testimony, or changed position on an issue.

*RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (quotation marks, alterations, and footnotes omitted).

National's bad faith litigation conduct began at the outset of the case, when National moved to compel arbitration. At the time, National knew that James had opted out of arbitration, having made that point affirmatively as a basis for dismissing her earlier federal action. National thus knew that its motion to compel arbitration had no factual basis, James moved for sanctions under Rule 11. I granted the motion.

National's misconduct continued during discovery. James sought documents and information relating to the loans offered by National since September 20, 2010, including an electronic copy of the data from any database containing the loan information.

National moved for a protective order, contending that the discovery was overbroad. I partially granted National's motion, but I also required National to provide discovery in response to other requests or narrowed versions of the requests. *See* Dkt. 44 (the "First Discovery Order"). Most pertinently, the First Discovery Order required National to provide specified categories of information about loans made between September 20, 2010, and September 30, 2013, including information about loan APRs (the "Loan History Information").

On February 28, 2014, National produced an Excel spreadsheet that purported to provide the Loan History Information (the "Initial Spreadsheet"). But National failed to comply with the First Discovery Order by neglecting to include all of the Loan History Information.

James' counsel used the few loan documents they already had to check the APRs for those loans against the limited data provided on the Initial Spreadsheet. The figures did not match. James' counsel then deposed National's owner and top dog, Tim McFeeters. He suggested that the Initial Spreadsheet contained errors. He also testified that the Delaware State Banking Commission had audited National between four and ten times and expressed concerns about inaccurate APRs.

On March 27, 2014, James moved for an emergency temporary restraining order after McFeeters appeared at James' home and allegedly threatened her. National contested the factual allegations but stipulated to a temporary restraining order that

required McFeeters to remain at least 2,000 feet from James and to refrain from contacting her except through counsel.

On July 17, 2014, James again moved to compel production of the Loan History Information. I entered a second order requiring National to provide accurate Loan History Information. Dkt. 120 (the "Second Discovery Order").

National did not comply with the Second Discovery Order, resulting in a written decision imposing sanctions on National and its counsel. *See James v. Nat'l Fin. LLC*, 2014 WL 6845560, at *1 (Del. Ch. Dec. 5, 2014). That decision found that "National and its counsel willfully disregarded their discovery obligations and sought to mislead James and her counsel." *Id.* at *12. As a remedy, it was deemed established for purposes of trial that the APRs disclosed on an updated spreadsheet of Loan History Information were incorrect and fell outside the tolerance permitted by TILA.

During the pre-trial conference and after testimony at trial, it became clear that National concealed additional evidence during discovery. James had requested all documents relating to the Disputed Loan. Through its electronic loan management software—the Payday Loan Manager—National maintained electronic records for every loan, including the Disputed Loan. National, however, did not produce these records, nor did it identify the Payday Loan Manager as a source of information.

During depositions, one of National's witnesses testified about a system National used to keep notes on its loans. This was one of the types of information maintained in the Payday Loan Manager. After James specifically requested the notes, National

produced a printout of them (the "First Version"). The document had occasional white space in odd places, but it was not marked to indicate that any information had been redacted. It also did not identify by name any of the individuals who had made any of the notes. James' counsel used the First Version in discovery.

Less than a week before trial, National produced another printout of the notes (the "Second Version"). During the pre-trial conference, National's counsel represented that he provided the Second Version because it was easier to read, and he proposed to substitute the Second Version for the First Version. James objected, citing inconsistencies between the two versions. Among other things, the Second Version had a column that identified the National employees who had entered the notes into the system. That column was missing from the First Version. National had redacted it entirely, but without revealing that it had made the redaction. National had redacted some of the employees' names from the Second Version as well, but the names were blacked out so at least a reader could tell that redactions had been made. James also identified one entry on the Second Version that contained text which had been redacted from the First Version, although in a manner that did not reveal that any redaction had been made. Over National's objection, I entered both versions into evidence.

During trial, it was revealed that National had not produced any of the other types of information about the Disputed Loan that were maintained in the Payday Loan Manager. Most notably, National never produced the loan payment history for the

Disputed Loan. At trial, National's witnesses claimed they could not respond accurately to questions about the Disputed Loan without the loan payment history.

Also during trial, James identified a series of items that did not appear on the First Version but did appear on the Second Version, as well as items that did not appear on the Second Version that did appear on the First Version. In an effort to explain the changes, National's witnesses testified, and its counsel represented, that the Payday Loan Manager distinguished between "comments," which an employee could enter but which could not be deleted or edited, and "notes," which could be deleted or edited. This explanation did not help National, since the differences between the two loan versions meant that someone had modified the records during the pendency of the case, after the production of the First Version. But it at least provided a reason for the changes.

In a further attempt at explanation, National's counsel admitted for the first time at trial that he had made redactions to the First Version. He claimed that he concluded that the names of the individuals who entered the notes were not relevant and hence redacted them. Then, when preparing for trial, he concluded that the names of the individuals who entered the notes were relevant, so he prepared the Second Version.

Both explanations were notably different than how National's counsel had justified the Second Version during the pre-trial conference. At the time, he claimed that he produced it simply because it was more legible.

In its post-trial answering brief, National offered yet another explanation for the Second Version, this time supported by a post-trial affidavit from McFeeters. The new

story was that an unknown employee inadvertently filtered out a category of entries called "Admin Notes" when preparing the Second Version. The filter story was contrary to the explanations provided at trial and to the prior representations (themselves internally inconsistent) that National's counsel made to the court. The claim that the "Admin Notes" were filtered out also did not explain why some notes were still present.

Amazingly National argued that James had not suffered any prejudice from the multiple problems surrounding the First and Second Versions because *by the time of trial,* James had both versions. Of course, James had not been able to use the concealed information on the First and Second Versions during discovery, James never received other relevant information about the Disputed Loan that National maintained in the Payday Loan Manager, and James only learned of the full extent of these problems during trial itself, after it was too late for the problems to be fully remedied without a litigation do-over.

The Second Version was a false record that National submitted to the court with the apparent intention to mislead this tribunal. National's attempts to explain the falsified record were internally inconsistent and, by logical necessity, someone on National's side of the "v" proffered a false explanation, whether by affidavit, testimony, or through representations made to the court.

This pattern of behavior established that National and its counsel sought to deceive this court and opposing counsel and to strong-arm James by unnecessarily prolonging litigation over what National regarded as a small-dollar loan. The bad faith with which

National and its counsel acted throughout this litigation provides an independent basis for awarding James her attorneys' fees.

## C.     Other Objections And The Amount Of The Fee Award

National raised various procedural arguments. None have merit. National's challenge to the reasonableness of the amount sought is frivolous. James asked for a total Fee Award of $331,024.50, which excluded fees previously awarded as a discovery sanction. This request covered multiple rounds of written discovery, often including repeated deficiency letters and motions to compel. It covered ten depositions and extensive substantive motion practice. It covered James' expert and the time and expense of deposing National's expert. It also covered a three-day trial plus pre- and post-trial briefing. Given all that James' counsel accomplished, the total requested is low. Many similarly qualified Chancery practitioners would have charged at least double that amount. National should be commending James' counsel for their efficiency, particularly in light of National's bad-faith efforts to obstruct this litigation.

James is entitled to the full amount sought. Given the seriousness of the misconduct in which National and its counsel engaged, they are jointly and severally liable for the Fee Award.

Very truly yours,

/s/ J. Travis Laster

J. Travis Laster
Vice Chancellor